## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARTIN J. WALSH, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,** | : : : : | **CIVIL ACTION NO. 1:21-CV-1730** |
| | : | **(Judge Conner)** |
| **Plaintiff** | : : | |
| **v.** | : : | |
| **MEDSTAFFERS LLC and KRISTA KREBS,** | : : : | |
| **Defendants** | : : | |

## MEMORANDUM

Plaintiff Martin J. Walsh, in his official capacity as Secretary of the United States Department of Labor ("Secretary Walsh"), alleges that defendants have committed, and continue to commit, violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*  Secretary Walsh moves the court to enjoin further violations by defendants and to require defendants to implement certain corrective measures.  The court will deny Secretary Walsh's motion.

## I.   Background

Secretary Walsh commenced this action with the filing of a complaint on October 8, 2021.  Secretary Walsh contemporaneously moved for a temporary restraining order and preliminary injunction pending resolution of his claims on the merits.  We denied the request for a temporary restraining order and promptly convened a preliminary injunction hearing over the course of two days, on October 14, 2021, and October 19, 2021.  The parties have filed proposed findings of fact and

conclusions of law as ordered by the court.  Secretary Walsh's motion is ripe for disposition.

## II.    **Findings of Fact**[1]

Defendant MedStaffers LLC ("MedStaffers") is business located in Carlisle, Pennsylvania, that provides in-home healthcare services.  (See Doc. 19 ¶ 1; Doc. 20 ¶ 1; see also Doc. 3-3).  Defendant Krista Krebs is MedStaffers' chief executive officer.  (See Doc. 19 ¶ 2; Doc. 20 ¶ 1).

In October 2020, the Wage and Hour Division of the United States Department of Labor ("the Department") began investigating defendants.  (See Doc. 19 ¶¶ 7, 9; Doc. 20 ¶ 3).  The case was initially assigned to investigator George Colon before being reassigned to investigator Maria Nunez ("Investigator Nunez") on January 7, 2021.  (See Doc. 19 ¶¶ 11-12).  A few weeks later, on January 29, 2021, Investigator Nunez contacted defendants' attorneys—Wendell Courtney, Esquire ("Attorney Courtney"), and Starling Colon, Esquire—to introduce herself and to alert them to the reassignment.  (See Doc. 20 ¶ 3; see also 10/14/21 Tr. 5:22-6:23).

Investigator Nunez began conducting telephonic employee interviews on February 5, 2021.  (See Doc. 19 ¶ 13).  That same day, Debra Simmons, MedStaffers' Vice President for Organizational Development, contacted Attorney Courtney and relayed that two employees had called her expressing confusion and concern about

---

[1] Consistent with the directive of Federal Rule of Civil Procedure 65(d), the following factual narrative represents the court's findings of fact as derived from the record.  The court convened a preliminary injunction hearing over the course of two days on October 14, 2021, and October 19, 2021.  The court cites to the transcript of those hearings as "10/14/21 Tr. __" and "10/19/21 Tr. __," respectively. The findings of fact set forth herein reflect the court's credibility determinations.

calls they received from Investigator Nunez.  (See id. ¶¶ 13-14; 10/19/21 Tr. 4:18-5:5).

Simmons asked Attorney Courtney how to respond, and Attorney Courtney advised

Simmons to return the employees' calls, confirm that the Department of Labor is

actively investigating MedStaffers, and instruct the employees to call Investigator

Nunez back, "listen to her questions, and answer them to the best of their ability."

(See 10/19/21 Tr. 5:5-14).  After giving Simmons' inquiry further thought, Attorney

Courtney determined an informative letter should be sent to all employees advising

them of the ongoing investigation, ostensibly to stem off further confusion.  (See id.

at 5:17-24).

   Attorney Courtney drafted a letter to be circulated by Krebs to all

MedStaffers employees, reproduced below:

> I am writing to advise you that the Wage and Hour
> Division of the United States Department of Labor
> ("DOL") is conducting an investigation of MedStaffers
> under the Fair Labor Standards Act and the Family and
> Medical Leave Act.
>
> This is a routine matter, and MedStaffers is fully
> cooperating with the DOL in this investigation.  As part of
> our cooperation, we have provided various documents
> that the DOL has requested, including your name,
> address, phone number, job title, rate of pay and hours
> worked.
>
> The DOL Investigator assigned to this matter is Maria
> Nunez, and it is possible that she may contact you to ask
> you some questions about your rate of pay, hours worked,
> overtime pay if applicable, and so forth.  I encourage you
> to speak with Ms. Nunez if she contacts you, as there is
> nothing for you to be concerned about in communicating
> with her.  If you are contacted by Ms. Nunez, please keep
> the following points in mind.
>
> * Always tell the truth.

> \* Listen carefully to her question, and ask her to repeat it if you do not understand.
>
> \* Answer only the question that is asked, and wait for the next question.
>
> \* Provide only firsthand knowledge in response to the question.
>
> \* Do not guess or speculate in response to any question.
>
> \* Answering 'I don't know' or 'I don't remember' is appropriate, when true.
>
> We are confident that the policies, procedures and practices of MedStaffers are in compliance with the Fair Labor Standards Act and the Family and Medical Leave Act, and we welcome this governmental review by the DOL to confirm our compliance with applicable laws.
>
> If you have any questions or concerns, or if you wish to speak with someone before or after speaking with Ms. Nunez, please feel free to contact me, Tracy DeHart or Dianna Jedlowski.

(See Doc. 3-4; see also 10/19/21 Tr. 5:25-6:2).  The letter was signed by Krebs and distributed to all MedStaffers' employees on February 8, 2021.  (See Doc. 19 ¶ 17; see also Doc. 20 ¶ 4; 10/19/21 Tr. 12:7-14).  Investigator Nunez learned of the letter in May and testified during the preliminary injunction hearing that she was concerned because it "seems to limit what the employee will say to me."  (See 10/14/21 Tr. 8:5-6, 20:18-25, 22:4-8).  Investigator Nunez did not contact MedStaffers at the time, however, as she was "still conducting interviews" and "wanted to know how the letter affected the employees."  (See id. at 23:7-12).  No employee told Investigator Nunez during an interview that management had instructed them not to cooperate or answer questions.  (See Doc. 19 ¶ 24; see also 10/14/21 Tr. 21:25-22:3).

Taylor Wilkins is a former MedStaffers employee who participated in several interviews with Investigator Nunez.  (See Doc. 19 ¶¶ 35, 51; Doc. 20 ¶ 9).  In August 2020, before the Department began its investigation, MedStaffers placed Wilkins on a "plan of correction" due to poor job performance.  (See Doc. 19 ¶ 36; see also 10/19/21 Tr. 20:1-21:4).  Krebs testified that Wilkins, like many MedStaffers' employees, worked from home during the early months of the COVID-19 pandemic.  (See 10/19/21 Tr. 20:7-9).  According to Krebs, when staff returned to the office, they discovered "significant" issues with respect to accounting matters that Wilkins was responsible for, including delinquent billing in the amount of $800,000.  (See id. at 20:12-21:22).  Krebs drafted a performance plan for Wilkins together with Simmons, who was Wilkins' immediate supervisor.  (See id. at 21:20-25).  Wilkins took a period of paid medical leave in January 2021, and upon her return, voluntarily resigned, with her last day being March 5, 2021.  (See Doc. 19 ¶¶ 41-43).

Investigator Nunez first spoke with Wilkins "sometime in either late March or the beginning of April," after Wilkins had resigned.  (See 10/14/21 Tr. 9:9-12).  On April 9, Simmons—who was also personal friends with Wilkins—contacted Krebs and another MedStaffers' employee and requested a conference call.  (See 10/19/21 Tr. 25:4-9).  Simmons advised that she had just been speaking with Wilkins and that she had confronted Wilkins for "not being truthful" with Investigator Nunez.  (See id. at 25:9-17; see also id. at 26:4-9).  Around the same time, Krebs separately learned Wilkins had used Krebs' login credentials to gain unauthorized access to MedStaffers' servers on April 1, 2021, and had downloaded various documents.  (See id. at 28:2-30:2).  On April 29, Krebs sent Wilkins an angry email, lambasting

her for allegedly stealing MedStaffers' files and providing what Simmons had perceived to be false information to Investigator Nunez. (See Doc. 3-6; see also Doc. 19 ¶ 50; Doc. 20 ¶ 11). In her email, Krebs warned Wilkins that she would ask the FBI to investigate Wilkins' alleged "theft" and "wire fraud"; that her conduct was causing hardship to Simmons, her friend and former supervisor; and that Krebs would tell MedStaffers' employees that Wilkins was the reason MedStaffers could not afford to pay bonuses. (See Doc. 3-6). Krebs also expressed her belief that it was Wilkins' "lies" that had led Investigator Nunez "to open a 3 year loopback" on the MedStaffers' case. (See id. at 4). Krebs testified she never followed through on her threat to tell current employees about Wilkins' behavior. (See 10/19/21 Tr. 39:2-5).

In July 2021, MedStaffers placed Simmons on an open-ended, paid administrative leave. (See 10/19/21 Tr. 39:15-40:22). The basis for Simmons' leave appears to have been twofold: one, the substantial accounting mistakes Wilkins had made while under Simmons' supervision the year prior, and two, Simmons' ongoing health issues. (See 10/19/21 Tr. 39:15-41:22). Krebs explained that the accounting mistakes delayed MedStaffers' ability to provide certain requested documents to Investigator Nunez. (See id. at 39:24-40:3). Krebs clarified that there is no current plan to bring Simmons back to MedStaffers and that she remains on paid leave. (See id. at 40:6-22).

Investigator Nunez continued investigating and conducted additional interviews in July and September 2021. (See 10/14/21 Tr. 7:12-16). In September, Investigator Nunez spoke with another former MedStaffers employee, Melissa

Souders, (see Doc. 19 ¶ 58; Doc. 20 ¶ 14), who had last worked for MedStaffers

in February 2020, (see Doc. 19 ¶ 59).  According to Investigator Nunez, Souders

"indicated that when she requested information regarding her pay raise she was

told that if she continued asking those questions she would . . . lose her job."  (See

10/14/21 Tr. 13:16-19; see also Doc. 19 ¶ 58; Doc. 20 ¶ 14).

All told, Investigator Nunez interviewed approximately 30 employees during

the course of her investigation.  (See Doc. 19 ¶ 62; see also 10/14/21 Tr. 7:12-25).  She

testified that, of those employees, "[a]bout five" had expressed a concern their jobs

may be in jeopardy should their names be attached to the investigation.  (See Doc.

19 ¶ 62; see also 10/14/21 Tr. 13:22-14:1).  Secretary Walsh invoked the informer's

privilege, addressed *infra*, with respect to this line of questioning and no further

details were made available to the defense about these employee statements.  (See

10/14/21 Tr. 14:3-16:12; 26:16-27:24).  The Secretary has submitted these employee

statements to the court *in camera* for consideration in assessing his request for

injunctive relief.

In their posthearing submissions, defendants reported that a final

conference to discuss the Department's findings was held on November 4, 2021, and

that it appears the investigation has concluded.  (See Doc. 19 ¶¶ 31-32).  The court

convened a telephonic conference with the parties on November 22, during which

Secretary Walsh's counsel represented that the "initial phase" of the investigation

is complete and the case would now progress to the "litigation phase."

### III.     Legal Standard

A preliminary injunction is an extraordinary remedy and should issue

only in limited circumstances.  See Issa v. Sch. Dist. of Lancaster, 847 F.3d 121, 131

(3d Cir. 2017) (citing Ferring Pharm., Inc. v. Watson Pharm., Inc., 765 F.3d 205, 210

(3d Cir. 2014)).  The court applies a four-factor test in determining the propriety of

preliminary injunctive relief.  The movant must, as a threshold matter, establish

the two "most critical" factors: likelihood of success on the merits and irreparable

harm.  Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017).  Under the first

factor, the movant must show that "it can win on the merits."  Id.  This showing

must be "significantly better than negligible but not necessarily more likely than

not."  Id.  The second factor carries a slightly enhanced burden: the movant must

establish that it is "more likely than not" to suffer irreparable harm absent the

requested relief.  Id.  Only if these "gateway factors" are satisfied may the court

consider the third and fourth factors: the potential for harm to others if relief is

granted, and whether the public interest favors injunctive relief.  Id. at 176, 179.

The court must then balance all four factors to determine, in its discretion,

whether the circumstances favor injunctive relief.  Id. at 179.

### IV.     Discussion

Secretary Walsh alleges that defendants are violating the FLSA in two

ways: first, by retaliating against employees in violation of Section 15(a)(3), and

second, by interfering with Secretary Walsh's investigation in violation of Section

11(a).  Secretary Walsh moves the court to preliminarily enjoin defendants from

continuing these alleged violations and to order defendants to implement certain

remedial measures.

### A.      Likelihood of Success on the Merits

To establish a likelihood of success on the merits, a movant must produce

sufficient evidence to satisfy the essential elements of the underlying cause of

action.  See Punnett v. Carter, 621 F.2d 578, 582-83 (3d Cir. 1980).  We must examine

the legal principles controlling the claim and the potential defenses available to the

opposing party.  See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d

254, 264 (3d Cir. 2000).  A mere possibility that the claim might be defeated does not

preclude a finding of probable success if evidence clearly satisfies the essential

prerequisites of the cause of action.  Highmark, Inc. v. UPMC Health Plan, Inc., 276

F.3d 160, 173 (3d Cir. 2001).  A showing that is "significantly better than negligible

but not necessarily more likely than not" is sufficient to obtain preliminary

injunctive relief.  Reilly, 858 F.3d at 179.  The requisite strength of a claim on the

merits depends ultimately on the balance of the harms: "the more net harm an

injunction can prevent, the weaker the plaintiff's claim on the merits can be while

still supporting some preliminary relief."  Id.

### 1.      *Informer's Privilege*

Before determining whether Secretary Walsh has demonstrated a likelihood

of success on the merits of his retaliation and interference claims, we first address

his contested invocation of the informer's privilege with respect to certain evidence

in the Department's possession.  Our court of appeals has long recognized that the

"informer's privilege" applies to FLSA investigations.  See Mitchell v. Roma, 265

F.2d 633, 635-36 (3d Cir. 1959).  The privilege encourages employees to freely share

their knowledge about violations of the law by offering anonymity once they come

forward.  See id. (citing Roviaro v. United States, 353 U.S. 53 (1957)).  The privilege

"must give way," however, when "the disclosure of an informer's identity is relevant

and helpful to the defense of an accused, or is essential to a fair determination of a

cause."  See id. (quoting Roviaro, 353 U.S. at 60-61).

We note as a threshold matter that there are procedural problems with

Secretary Walsh's attempted invocation of the informer's privilege.  To properly

invoke the privilege, "[t]here must be a formal claim of privilege, lodged by the

head of the department which has control over the matter, after actual [personal]

consideration by th[at] officer."  United States v. O'Neill, 619 F.2d 222, 226 (3d Cir.

1980) (quoting United States v. Reynolds, 345 U.S. 1, 7-8 (1953)); Chao v. Raceway

Petroleum, Inc., No. 06-3363, 2008 WL 2064354, at *4 (D.N.J. May 14, 2008) (same).

Secretary Walsh's counsel admitted during the preliminary injunction hearing that

the Department's lawyers "haven't submitted a formal invocation of the privilege,"

offering that "we don't believe it's necessary at this time" and that "it's also quite a

production."[2]  (See 10/19/21 Tr. 44:16-18).  Nonetheless, even if the Secretary had

---

[2] Secretary Walsh argues it is *defendants* whose argument is procedurally
improper.  According to the Secretary, if a defendant wants access to privileged
information, the defendant must move to compel disclosure and demonstrate that
their need for the information outweighs the purpose behind the privilege.  (See
Doc. 20 at 20-21 & n.5).  This argument misapprehends the posture of this case;
defendants are not seeking discovery of the privileged statements for purposes of
preparing a defense to be lodged at some later juncture.  They are responding to the
Secretary's attempt to wield those statements against defendants now; defendants
argue only that the Secretary should not be permitted to use evidence against them
without first disclosing it to them.

properly invoked the privilege, we conclude that he cannot wield it in the manner he attempts here.

Secretary Walsh's proposed approach raises serious fairness concerns. He wants to use privileged statements to secure a preliminary injunction against defendants while at the same time barring defendants from accessing—and thus defending against—those very statements. (See Doc. 20 at 20). Secretary Walsh claims courts "routinely" permit the Department to "rely on anonymous witnesses even at the summary judgment stage." (See id. at 21 (citing Brennan v. Engineered Prods., Inc., 506 F.2d 299, 302 (8th Cir. 1974); United States v. Hemphill, 369 F.2d 539, 542 (4th Cir. 1966))). The cited decisions merely discuss when and to what extent informer-privileged information must be disclosed in advance of its use at trial. See Brennan, 506 F.2d at 302-03; Hemphill, 369 F.2d at 542. Neither decision supports the Secretary's claim that he may affirmatively use privileged evidence at the summary judgment or other pretrial stage while withholding that evidence from the defendant. Other decisions cited by the Secretary are also distinguishable. See, e.g., Acosta v. Fairmount Foundry, Inc., No. 17-4302, 2019 WL 196543, at *3 (E.D. Pa. Jan. 14, 2019) (observing "[a]s the parties *have yet to file summary judgment motions*, we cannot discern how the informants' identifies are important to [the defendant] right now" (emphasis added)); Perez v. Am. Future Sys., Inc., No. 12-6171, 2013 WL 5728674, *5-6 (E.D. Pa. Oct. 21, 2013) (rejecting a defense request to lift privilege broadly during discovery when Department had agreed to waive the privilege for witnesses used in support of summary judgment motion). Secretary Walsh has not cited a single case to support his view that he may rely on privileged statements to

obtain a preliminary injunction while refusing to disclose those statements to defendants.

Secretary Walsh cannot have his cake and eat it too.  The Department has a choice when it comes to the informer's privilege: it can invoke the privilege and keep the information to itself, forgoing reliance on that evidence to meet its burden of proof, or it can waive the privilege and enter the information into evidence.  See, e.g., Perez, 2013 WL 5728674, at *5 (citing Martin v. N.Y.C. Transit Auth., 148 F.R.D. 56, 63-65 (E.D.N.Y. 1993); Sec'y of Labor v. Superior Care Inc., 107 F.R.D. 395, 396-97 (E.D.N.Y. 1985)).  What the Department cannot do is pursue the extraordinary remedy of a preliminary injunction by relying on evidence it refuses to disclose to defendants.  Accordingly, we will not consider the materials submitted to the court *in camera* in our preliminary injunction ruling.

### 2.    *Likelihood of Success*

Secretary Walsh grounds his request for preliminary injunctive relief in two claims under the FLSA: a retaliation claim, and an interference claim.  We find that, on the existing record, the Secretary has failed to establish a reasonable likelihood of success on the merits as to either.

We begin our analysis with the interference claim.  Section 11(a) of the FLSA authorizes the Secretary of the Department to investigate potential violations of the Act.  See 29 U.S.C. § 211(a).  Specifically, Section 11(a) permits the Secretary to, *inter alia*, "enter and inspect such places and such records . . . , question such employees, and investigate such facts, conditions, practices, or matters as he may deem necessary or appropriate" to determine whether a violation has occurred or

to aid in enforcement of the Act. <u>See</u> <u>id.</u> Section 11(a) also permits the Secretary to commence a civil action under Section 217 of the FLSA to "restrain violations of this chapter." <u>See</u> <u>id.</u>; <u>see also</u> 29 U.S.C. § 217 (vesting jurisdiction in district courts to restrain violations of FLSA).

Secretary Walsh's interference claim is narrow: he asserts defendants obstructed the Department's investigation by sending a letter to employees in February 2021 about that investigation. (<u>See</u> Doc. 1 ¶ 6; Doc. 20 at 14-15; <u>see also</u> 10/14/21 Tr. 24:16-25:13). Secretary Walsh claims the letter "instructs employees to provide as little information as possible to the Secretary's investigator," and that it suggests "employees can be subject to discipline, or at a minimum could reasonably believe that they will be subject to discipline, if they do not follow it." (<u>See</u> Doc. 20 ¶ 8). As the court signaled during the evidentiary hearing, this reading of the letter is a stretch. (<u>See</u> 10/14/21 Tr. 18:7-12). The letter encourages employees to speak with Investigator Nunez and to be honest with her. (<u>See</u> Doc. 3-4). While the letter does tell employees to answer "only the question that is asked," (<u>id.</u>), that statement cannot fairly be read, given the letter's broader encouragement to cooperate, as an instruction to provide "as little information as possible" under threat of employee discipline. Importantly, it does not appear that any employee construed the letter as Secretary Walsh does: according to Investigator Nunez, not one employee told her they had been instructed not to cooperate or answer questions. (<u>See</u> 10/14/21 Tr. 21:25-22:3). Secretary Walsh has not established a reasonable likelihood of success on this interference claim.

The present record also fails to demonstrate a reasonable likelihood of success on Secretary Walsh's retaliation claim.  Employers are prohibited under Section 15(a)(3) of the FLSA from discharging or otherwise discriminating against employees who have filed a complaint or instituted any proceeding under the Act. See 29 U.S.C. § 215(a)(3).  To establish a *prima facie* face of retaliation under the FLSA, the Secretary must prove (1) an employee engaged in protected activity, (2) defendants took adverse action against the employee, and (3) a causal link exists between the protected activity and the adverse action.  See Jones v. Amerihealth Caritas, 95 F. Supp. 3d 807, 814 (E.D. Pa. 2015) (citation omitted).  Communicating with the Department's wage-and-hour investigators constitutes protected activity. See Brock v. Richardson, 812 F.2d 121, 124 (3d Cir. 1987) (citing with approval Daniel v. Winn-Dixie Atl., Inc., 611 F. Supp. 57 (N.D. Ga. 1985)).

Secretary Walsh's retaliation claim rests on wafer-thin grounds.  The first, an email from MedStaffers' chief executive officer Krista Krebs to former employee Taylor Wilkins, appears to be nothing more than the unfortunate byproduct of a bitter post-employment relationship between Krebs and Wilkins.[3]  True, Krebs sent the email after she learned Wilkins had met with Investigator Nunez, and the email references Wilkins providing information to Investigator Nunez.  But it is clear from the email and Krebs' explanatory testimony that her primary concern was Wilkins'

---

[3] Secretary Walsh has not directed the court to any case law supporting his view that a former employee may bring a retaliation claim based on something that occurred after their employment ended.  We express no opinion whether such a claim is viable; our analysis merely assumes *arguendo* that it may be.

alleged theft of company files and alleged "lies" to the investigator, not the mere fact of cooperation. (See 10/19/21 Tr. 28:1-31:24; see also Doc. 3-6 at 3-5). Indeed, the record evidence reflects that as soon as employees started asking questions about the investigation, MedStaffers wisely sought attorney guidance and Krebs circulated a counseled letter encouraging employees to speak—and speak honestly—with Investigator Nunez. (See Doc. 3-4).

The second instance of alleged retaliation is even further attenuated and comes from a hearsay statement offered through Investigator Nunez. According to Investigator Nunez, during a September 2021 interview, former employee Melissa Souders "indicated that when she requested information regarding her pay raise she was told that if she continued asking those questions she . . . would lose her job." (See 10/14/21 Tr. 13:14-19). Secretary Walsh introduced no evidence to contextualize this hearsay statement—thus, we do not know when it was made (although we assume it predated Souders last day of work with MedStaffers in February 2020), or more importantly, by whom it was made. (See id.)

Secretary Walsh's third allegation of retaliatory conduct also lacks proof. He claims MedStaffers "suspended [Debra] Simmons because of her association with Wilkins." (See Doc. 20 ¶ 13). But the only evidence of record about Simmons' suspension came from Krebs, who explained that Simmons was placed on paid administrative leave not because of her personal relationship with Wilkins, but for her professional one: as Wilkins' former supervisor, MedStaffers held Simmons responsible for a series of significant and costly billing errors Wilkins made while still employed with MedStaffers. (See 10/19/21 Tr. 20:12-21:19, 39:10-40:13). Krebs

also cited Simmons' ongoing health issues as an additional rationale for her continued administrative leave. (See id. at 40:16-22). Krebs denied that Simmons' suspension was related to her friendship with Wilkins. (See id. at 40:14-22). For all of these reasons, the inference that Secretary Walsh asks us to draw—that Simmons was really suspended in retribution for her friendship with an FLSA informer—is simply not supported by the record.

Additional passing claims woven throughout Secretary Walsh's papers are likewise unsubstantiated. There is no evidence in the record, for example, that MedStaffers threatened employees not to participate in the investigation. (Cf. Doc. 20 ¶ 15). Investigator Nunez indicated "[a]bout five" of the 30 employees she spoke with expressed concern their jobs might be jeopardized if their names were publicly associated with the investigation.[4] (See 10/14/21 Tr. 13:22-14:1). But the Secretary has not submitted any evidence linking this hesitation to anything MedStaffers or Krebs may have said or done. Secretary Walsh also suggests MedStaffers tried to make examples of Wilkins, Souders, and Simmons, and that this conduct is a retaliatory adverse action against all employees, since other employees may be disinclined to cooperate in an FLSA investigation if they "heard their employer threaten cooperating witnesses." (See Doc. 20 at 12). This theory too fails for lack of proof: there is no evidence that other MedStaffers' employees were even aware of anything that happened with Wilkins, Souders, or Simmons.

---

[4] The exhibits submitted to the court *in camera* reflect three, not five, individuals who asked not to be identified.

16

Finally, to the extent Secretary Walsh avers Krebs' February 8 letter was also a retaliatory adverse employment action as to all employees, we disagree. (Cf. Doc. 20 at 9-11). As we observed *supra*, it takes a strained reading to interpret the informational letter as threatening. Indeed, the Secretary's own investigator does not perceive the letter as retaliatory. (See 10/14/21 Tr. 22:16-19 (Q: "But this isn't a retaliation letter. This is an investigation letter, right?" A: "It's not retaliation, but it limits, it interferes with the investigation.")). We thus reject the Secretary's claim that this letter constitutes a company-wide act of retaliation.

On the existing record, Secretary Walsh has not established a "significantly better than negligible" likelihood of success on the merits. See Reilly, 858 F.3d at 179. This is not to say Secretary Walsh cannot prevail on his claims; only that the Secretary has failed to carry his burden of proof at this stage. See id.

### B.      Irreparable Harm

Irreparable injury is harm of such an irreversible character that prospective judgment would be "inadequate" to make the moving party whole. See Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997); Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). Our court of appeals has emphasized that "the risk of irreparable harm must not be speculative." Adams v. Freedom Forge Corp., 204 F.3d 475, 488 (3d Cir. 2000). And a "showing of irreparable harm is insufficient if the harm will occur only in the indefinite future." Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992). Rather, the moving party must establish that the harm is imminent and probable. Anderson, 125 F.3d at 164. The required showings on irreparable harm and likelihood of success are correlative: thus, the weaker a

17

plaintiff's merits showing, the more is required of the showing of irreparable harm, and vice versa. See Reilly, 858 F.3d at 179 (quoting Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, J.)).

Secretary Walsh argues he is not required to demonstrate a likelihood of irreparable harm since a federal statute authorizes the requested injunctive relief. (See Doc. 20 at 15-16 (citing Gov't of V.I. v. V.I. Paving, Inc., 714 F.2d 283, 286 (3d Cir. 1983))). We question the vitality of the Secretary's argument in light of more recent case law narrowing the circumstances in which irreparable harm may be presumed and reaffirming the traditional four-factor test absent clear congressional intent to the contrary. See, e.g., Chester *ex rel.* N.L.R.B. v. Grane Healthcare Co., 666 F.3d 87, 95-97 (3d Cir. 2011) (discussing Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982), and Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008), and finding congressional intent to depart in context of National Labor Relations Act)); see also Acosta v. Austin Elec. Servs. LLC, 322 F. Supp. 3d 951, 955-56 (D. Ariz. 2018) (applying four factors to request for preliminary injunction under FLSA); Scalia v. Unforgettable Coatings, Inc., 455 F. Supp. 3d 987, 991-992 (D. Nev. 2020) (same).

The Secretary concedes, however, that he must at the very least establish an ongoing or prospective violation to obtain a preliminary injunction. (See Doc. 20 at 7 (arguing the Secretary need only show defendants "are engaged in, or are about to be engaged in, acts or practices prohibited by the FLSA")). And this is where the most fundamental problem with the instant motion lies. The Secretary has not adduced any evidence of an *ongoing* statutory violation, or even a probable future

one.  The only examples of allegedly retaliatory conduct in the record are isolated

incidents—one occurring sometime before February 2020, another in April 2021,

and a third in July 2021.  There is simply no evidence of an ongoing violation of the

FLSA.  Moreover, during a telephonic conference on November 22, 2021, Secretary

Walsh's counsel represented that the initial phase of the investigation has now

concluded, and the litigation phase is about to begin.  Counsel posited during the

conference that the Department will continue to investigate as litigation proceeds,

and it is thus *possible* that defendants *may* retaliate against employees who *may*

cooperate at a later stage.  At this juncture, these concerns are purely hypothetical.

We cannot grant preliminary injunctive relief absent some evidence of an ongoing

statutory violation.[5]

### C.    Remaining Factors

Secretary Walsh has failed to establish the first two "gateway" factors for

preliminary injunctive relief.  See Reilly, 858 F.3d at 176, 179.  Accordingly, we need

not address whether defendants would suffer greater harm than that alleged by the

---

[5] During the conference, the court inquired whether Secretary Walsh's motion is now moot.  The Secretary's counsel insisted it is not, based on his view that interference and retaliation may occur during the litigation phase as well. While that may be true, we note that the complaint as currently styled is narrowly tailored to the investigation phase.  (See, e.g., Doc. 1 at 2 (averring injunction is necessary "[b]ecause Defendants have been retaliating against employees who were either communicating with, or who were believed to be communicating with or about to communicate with representatives of the Secretary, and have otherwise been interfering with the Secretary's investigation")).  For purposes of the instant motion, we accepted the Secretary's representation that the matter is not moot.

Secretary if injunctive relief is granted, or whether the public interest favors the requested relief.  See id.

## V.      Conclusion

Secretary Walsh has not demonstrated that the extraordinary remedy of a preliminary injunction is warranted on the present record.  See Issa, 847 F.3d at 131 (citing Ferring Pharm., Inc., 765 F.3d at 210).  Accordingly, we will deny Secretary Walsh's motion.  Our denial will be without prejudice to the Secretary's right, if he so chooses, to waive the informer's privilege and refile his motion with the support of evidence not considered herein.  An appropriate order shall issue.


                                             /S/ CHRISTOPHER C. CONNER
                                             Christopher C. Conner
                                             United States District Judge
                                             Middle District of Pennsylvania

Dated:      November 24, 2021